ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL X

| JOSÉ JAVIER CASIANO VEGA Y OTROS<br><br>Apelantes<br><br>v.<br><br>UNITED PARCEL SERVICE., INC. Y OTROS<br><br>Apelados | TA2025AP00641 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Carolina<br><br>Caso Núm.:<br>CA2019CV03985<br><br>Sobre:<br>Daños y Perjuicios |
| --- | --- | --- |

Panel integrado por su presidenta la Juez Grana Martínez, el Juez Ronda Del Toro y la Juez Lotti Rodríguez

**Ronda Del Toro, Juez Ponente**

# SENTENCIA

En San Juan, Puerto Rico, a 28 de enero de 2026.

Comparece José Javier Casiano Vega, (en adelante, señor Casiano o el apelante) Elizabeth Varona Yong, ambos por sí y en representación de la Sociedad Legal de Gananciales compuesta por ambos; y Pyon Yong Cha[1] (en conjunto, la parte apelante") mediante recurso de *Apelación* presentado el 5 de diciembre de 2025, en el cual nos solicita que dejemos sin efecto la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de Carolina (TPI o foro primario) el 5 de noviembre de 2025. Mediante el referido dictamen, el foro primario ordenó la desestimación con perjuicio de la *Demanda* del epígrafe.

## I.

El 14 de octubre de 2019, la parte apelante presentó la *Demanda* del epígrafe sobre daños y perjuicios en contra de

---

[1] De los autos del presente caso, surge que la co-demandante, Pyon Yong Cha, falleció durante el curso de la presente causa de acción, sin que se haya sustituido su parte.

United Parcel Service, Inc. ("UPS"), PS, Caribbean Airport Facilities Inc. ("CAF"), Autoridad de Puertos de Puerto Rico ("APPR") y otros codemandados desconocidos.[2] En la *Demanda* presentada, la parte apelante le imputó negligencia a UPS por el señor Casiano haber sido asaltado y baleado el 21 de enero de 2016, cuando ejercía funciones como mensajero de camión blindado para la compañía Ranger American. Esa noche del incidente, este realizaba la entrega de un bulto (maletín o valija) con dinero en las facilidades de la Base Aérea Muñiz en el Aeropuerto Internacional Luis Muñoz Marín.

En la *Demanda*, el señor Casiano alegó que mientras laboraba para la compañía Ranger American de Puerto Rico, se personó hasta las facilidades de UPS para entregar una valija de dinero que sería transportada por UPS. El señor Casiano alegó que personal de UPS no le permitió entrar con el camión blindado dentro de las facilidades para que este pudiese entregar las valijas de dinero de manera segura, siendo éste asaltado y baleado. Por tanto, el señor Casiano sostuvo que UPS era responsable del daño ocurrido ya que faltó a su deber de haber tomado aquellas medidas razonables y adecuadas de seguridad de forma tal que sus facilidades y alrededores estuvieran seguros de cualquier actividad criminal previsible. Igualmente, adujo que UPS faltó a su deber de previsibilidad en el sentido de tener suficientemente iluminada el área y sus alrededores, así como contar con cámaras de seguridad que estuvieran en todo momento monitoreando el lugar y sus alrededores; contar con personal suficiente de seguridad, y que estuviera capacitado, y pendiente y en total

---

[2] Entrada #1 del Sistema Unificado de Manejo y Administración de Casos del Tribunal de Primera Instancia (SUMAC TPI).

control del área y sus alrededores. Asimismo, el haber, inclusive, protegido al apelante, permitiéndole la entrada oportuna, y en especial en el camión, adentro de las facilidades de la demandada.

Posterior a una prórroga autorizada por el foro primario, el 13 de enero de 2020, UPS presentó la *Contestación a la Demanda* en la cual alegó que la demanda no adujo la existencia de una causa de acción en contra de este ni hechos que justificasen la concesión de un remedio, por lo que debía ser desestimada.[3] Además, UPS levantó como defensa afirmativa que no realizó actos u omisiones alguna, ni actuó con culpa, negligencia ni temeridad que pudiese considerarse la causa próxima o interventora de los daños alegados por la parte apelante, ya que el señor Casiano asumió el riesgo de sus propios actos.

Además, UPS negó que fuera responsable del control y mantenimiento del área donde fue baleado el señor Casiano[4] y que hubiese fallado en tomar aquellas medidas razonables y adecuadas de seguridad de forma tal que estuviesen seguros de cualquier actividad criminal previsible por UPS. Por último, UPS adujo que no creó ningún daño de ningún tipo a la parte apelante por lo que no responde ni directa, ni solidariamente, de ningún daño sufrido por el señor Casiano reclamado en la *Demanda*. Culminado el descubrimiento de prueba, el TPI concedió a ambas

---

[3] Entrada #17 de SUMAC TPI.
[4] UPS alegó como Defensa Afirmativa que de la Sentencia dictada en el caso FDP2018-0014, a la cual la parte demandante hizo referencia en la Demanda, surge que (1) el Tribunal, resolvió que la propiedad en que ocurrieron los hechos a los que se refiere la Demanda no están bajo el control ni mantenimiento de UPS; (2) la Sentencia declarada en el caso FDP2018-0014, no fue apelada por lo que la misma es final y firme; (3) los hechos y la causa de acción que se levantan en contra de UPS en la Demanda de epígrafe son idénticos a los levantados en la Demanda anterior; (4) lo resuelto por el Tribunal en cuanto a que la propiedad en que ocurrieron los hechos a los que se refiere la Demanda no están bajo el control ni mantenimiento de UPS y constituye cosa juzgada.

partes hasta el 26 de noviembre de 2024 para presentar mociones dispositivas.[5]

Oportunamente, el 26 de noviembre de 2024, UPS presentó una *Solicitud de Sentencia Sumaria*, con 136 hechos incontrovertidos.[6] Por el contrario, la parte apelante no presentó moción dispositiva a su favor. Por su parte, UPS sostuvo que, de los hechos recopilados durante el descubrimiento de prueba y de las admisiones bajo juramento del apelante durante su deposición,[7] no existe controversia sobre hecho material alguno que amerite la celebración de un juicio en su fondo. Así pues, solicitó la desestimación con perjuicio de la *Demanda* instada, toda vez que UPS no incurrió en negligencia, actuación, omisión ni culpa alguna.

El 18 de febrero de 2025, la parte apelante presentó *Réplica a Moción de Sentencia Sumaria* presentada por UPS y para que se

---

[5] Durante vista sobre el Estado de los Procedimientos celebrada el 25 de junio de 2024, este Tribunal concedió a las partes un término hasta el 1 de noviembre de 2024 como fecha límite para presentar cualquier Moción Dispositiva y hasta el 22 de noviembre de 2024 para que presentaran su posición con relación, a cualquier Moción Dispositiva. Posteriormente, mediante Orden de 17 de octubre de 2024, concedimos a las partes hasta el 26 de noviembre de 2024 para presentar mociones dispositivas.

[6] Entrada #113 del SUMAC TPI (Como parte de la solicitud de sentencia sumaria, UPS presentó prueba documental admisible tales como declaraciones juradas, transcripciones de las deposiciones de los codemandantes Casiano, Pyon Elizabeth Varona, y evidencia documental incluyendo vídeos/grabaciones del incidente, los cuales el codemandante Casiano reconoció durante su deposición, provenientes de las cámaras de seguridad (cámaras de vigilancia) ubicadas en el exterior de las facilidades, indicando que lo alegado por Casiano en su demanda no es correcto).

[7] Surge de los documentos anejados a la moción de sentencia sumaria que los días 26 de junio de 2023 y el 20 de octubre de 2023, UPS tomó la deposición del demandante José Casiano Vega, y el 8 de noviembre de 2023, de la co-demandante Pyon Elizabeth Varona Yong. La transcripción de la primera deposición del demandante Casiano le fue notificada el 27 de junio de 2023 y la segunda transcripción, el 17 de noviembre de 2023 mediante correo electrónico. Casiano tuvo hasta el 27 de julio de 2023 y hasta el 17 de diciembre de 2023 respectivamente para notificar a la parte demandada cualquier objeción o corrección a las mismas. Por otro lado, la transcripción de la co-demandante Pyon Elizabeth Varona Yong fue notificada, mediante correo electrónico el día 12 de diciembre de 2023. Esta tenía hasta el 11 de enero de 2024 para notificar a UPS cualquier objeción o corrección a la misma. Ambos términos transcurrieron sin que los co demandantes notificaran objeción o solicitaran corrección alguna. Por lo que, las transcripciones de las deposiciones de los demandantes se entienden correctas.

dicte *Sentencia Sumaria* a favor de este.[8] En su escrito, la parte apelante, alegó que UPS intenta encubrir que es responsable por los daños ocasionados al señor Casiano. En respuesta, el 4 de abril de 2025, UPS radicó su oposición a la moción presentada por la parte apelante.[9] Allí, UPS alegó, entre otras cosas, que la solicitud de sentencia sumaria que el señor Casiano incluyó como parte de su Réplica fue presentada fuera del término concedido por el Tribunal para presentar mociones dispositivas. En específico, sostuvo que el foro primario les otorgó a ambas partes hasta el 26 de noviembre de 2024 para presentar mociones dispositivas, y que el término transcurrió sin que la parte apelante presentara moción dispositiva alguna o presentara prórroga. De igual modo, UPS adujo que el apelante no presentó hechos materiales ni pertinentes para probar que procedía dictar sentencia sumaria a su favor y que, además, fue incapaz de refutar los 136 hechos materiales presentados por UPS.

Luego de viarias mociones presentadas por ambas partes, el 5 de noviembre de 2025, el TPI dictó *Sentencia* en la que declaró "Ha Lugar" la Sentencia Sumaria a favor de UPS, por no existir controversia sobre ningún hecho material que hiciera necesaria la celebración de un juicio en su fondo.[10] A su vez, concluyó que los hechos materiales incontrovertidos demostraron que no existe responsabilidad alguna entre los hechos alegados y los daños reclamados en la *Demanda*. Además, sostuvo que, la parte apelante no logró configurar una causa de acción en daños

---

[8] Entrada #135 del SUMAC TPI (Como anejos de dicho escrito, la parte apelante acompañó copias de una Demanda y una Primera Demanda Enmendada presentada por UPS en contra de CAF y otros codemandados bajo el número de caso CA2019CV03985. Además, acompañó copia completa de la transcripción de la deposición tomada al codemandante Casiano por UPS el 20 de octubre de 2023.).
[9] Entrada #139 del SUMAC TPI.
[10] Entrada #151 del SUMAC TPI.

y perjuicios en contra de UPS. Igualmente, el foro primario concluyó que no tenía jurisdicción para atender la Réplica y Sentencia Sumaria del apelante ni la Brevísima Dúplica, debido a que ambas fueron presentadas fuera del término otorgado.

De otro lado, el TPI aclaró que la *Sentencia* declarada en el caso FDP2018-0014 no fue reconsiderada, apelada, ni revocada por lo que la misma advino final y firme. Por tanto, este explicó que lo resuelto por el Tribunal en ese caso constituye cosa juzgada, en cuanto a que la propiedad en que ocurrieron los hechos a los que se refiere la *Demanda* no están bajo el control ni mantenimiento de UPS. Asimismo, resolvió que lo que procede en Derecho es la desestimación de la *Demanda*.

A esos efectos, el foro primario formuló las siguientes determinaciones de hechos no controvertidos:

**Las facilidades de UPS ubicadas en el Aeropuerto Internacional Luis Muñoz Marín en Carolina, Puerto Rico.**

1. UPS tiene arrendadas unas áreas de oficinas y facilidades de hangar, almacén y rampas en y aledañas a un edificio propiedad de CAF localizado en los predios del Aeropuerto Internacional Luis Muñoz Marín en Carolina, Puerto Rico.

2. El arrendamiento de dichas facilidades emana de unos contratos ("Lease Agreements") del 5 de diciembre de 1990—firmado el 3 de septiembre de 1991—y del 22 de noviembre de 1991.

3. Ambos contratos de arrendamiento establecen que CAF es el dueño de las facilidades arrendadas, sujeto a un contrato entre CAF y la Autoridad de Puertos de Puerto Rico.

4. Como parte de los contratos, CAF pondría a disposición de UPS áreas de estacionamiento, acceso pedestre desde las facilidades arrendadas hacia el exterior del edificio y acceso vehicular entre el área de estacionamiento y la calle.

5. Específicamente, los contratos establecen que CAF sería el encargado de mantener y reparar todas las áreas sujetas a arrendamiento, incluyendo las áreas exteriores de estacionamiento y calles.

6. Los contratos establecen, además, que CAF, como parte de los servicios que provee a UPS, tendrá a su cargo la

seguridad de las áreas adyacentes a los predios arrendados.

7. De igual forma, como parte del acuerdo con UPS, cualquier responsabilidad por incidentes acaecidos en las áreas sujetas al arrendamiento recaerá sobre CAF, quien proveerá seguro de responsabilidad pública a favor de UPS.

8. Estos contratos se encontraban vigentes al 21 de enero de 2016.

9. La propiedad en que ocurrieron los hechos no está bajo el control ni mantenimiento de UPS. En específico, la propiedad en que ocurrieron los hechos pertenece a CAF quien, a su vez, tenía el control y mantenimiento de esta.

10. Entre las áreas arrendadas por UPS a CAF, hay un vagón el cual se encuentra en la zona de carga del Aeropuerto. Este vagón se conoce como el área de cotejo o "check point", y consiste en la entrada principal de los empleados de UPS a un área de hangar o zona de carga, la cual es identificada como "área estéril".

11. Por el vagón, solamente entran empleados contratistas y otro personal autorizado por UPS siguiendo los requisitos establecidos por la Administración Aeroportuaria y basado en regulaciones del TSA.

12. La entrada de este vagón es por su parte frontal y se accede a él desde el área exterior de estacionamiento. Este vagón, por su lado derecho, colinda con la carretera 150, conocida como la Avenida Tony Santana. Por su parte posterior, da acceso pedestre al área de área estéril.

13. El acceso vehicular hacia el área estéril es a través de unos portones cuyo acceso es limitado según las reglamentaciones de TSA y la Administración Aeroportuaria.

14. Según las reglamentaciones establecidas por TSA, no se pueden portar armas de fuego u otras armas en su persona o en su propiedad cuando se entra o se está dentro de un área estéril.

15. Como excepción, el personal considerado como "personal encargado de hacer cumplir la ley" ("Law Enforcement Officer" ("LEO") puede portar armas de fuego en su persona o en su propiedad cuando entra o está dentro de un área estéril; (1) durante su jornada de trabajo en el aeropuerto; (2) si es una persona autorizada a portar un arma de acuerdo con las secciones 1544.219, (a bordo de vuelos aprobados); sección 1544.221 (transferencia de prisioneros); sección 1544.223 (alguaciles aéreos); o subparte B de la sección 1562 del capítulo; o (3) si es una persona autorizada para portar un arma en un área estéril bajo un programa de seguridad.

16. Para la fecha de los hechos alegados en la demanda, los mensajeros de Ranger America y/o los choferes de

camiones blindados no eran considerados "Law Enforcement Officer" ("LEO"), por tanto, no podían entrar al área estéril a través del portón de acceso vehicular con un arma de fuego.

17. Debido a que Casiano es un mensajero armado y no es un "LEO", no podía entrar a las facilidades del aeropuerto con un arma de fuego a través del portón de acceso. El camión tenía que permanecer afuera en el área de estacionamiento.

18. En y alrededor del vagón hay postes con alumbrado eléctrico los cuales estaban encendidos y en funcionamiento el día de los hechos alegados por Casiano en la demanda. También había varios postes con alumbrado eléctrico en el área de estacionamiento los cuales estaban encendidos y funcionando.

19. Para la fecha de los hechos alegados en la demanda, el vagón tenía instaladas cámaras de seguridad ubicadas en la parte superior del punto de cotejo del vagón de UPS. La toma de dicha cámara de seguridad estaba orientada hacia el exterior, cerca del área de cotejo de acceso pedestre y hacia el portón de acceso vehicular de la entrada principal de los empleados de UPS.

**Hechos que no están en controversia relacionados con el empleo de Casiano, las posiciones que ocupó y experiencia profesional según surge del testimonio de Casiano y de las admisiones durante las deposiciones que le fueron tomadas.**

20. Casiano comenzó a trabajar, en febrero de 2008, en Ranger American de Puerto Rico, Inc. (en adelante "Ranger").

21. Antes de comenzar a trabajar en Ranger, Casiano trabajó, durante dos (2) años, para la compañía "Security Guard Affairs", en el Colegio de Bautista de Carolina y en el muelle de San Juan.

22. El primer puesto de Casiano para Ranger fue como escolta del mensajero de camiones blindados, que es la persona encargada de entregar los valores (en este contexto, "valores" se refiere a "efectivo (dinero), prendas y papeles importantes"). El demandante se desempeñó como escolta del mensajero de camiones blindados por tres meses.

23. Cuando Casiano trabajó como escolta para Ranger, explicó que, en un camión blindado, había tres personas: un chofer, un mensajero y un escolta, estos últimos dos armados.

24. Luego de ser escolta, Casiano comenzó a trabajar como mensajero de camiones blindados en Ranger, cargo que ocupó desde 2008 hasta 2016.

25. Desde el año 2016 hasta el momento en que se tomó deposición al demandante, Casiano se desempeñaba como radioperador de Ranger.

26. Para ser mensajero de camión blindado, se requería una licencia de Guardia de Seguridad—otorgada por el

Negociado de la Policía que se renovaba todos los años—, una licencia de portación de armas—que se renovaba cada seis años—y una licencia de la Comisión de Servicios Públicos, así como un entrenamiento anual dirigido al manejo de armas y charlas preventivas sobre la Ley de Armas de Puerto Rico.

27. Casiano posee licencia de portación de armas desde hace más de 10 años.

28. Al comenzar a trabajar como mensajero de Ranger, el 31 de mayo de 2008, Casiano recibió el Manual de Guardias de Seguridad para Empleados de Camiones Blindados, así como se comprometió, a seguir el Manual de Seguridad de Ranger.

29. Casiano desconocía si los protocolos de seguridad se encontraban en estos documentos debido a que nunca los terminó de leer porque esta actividad le producía sueño.

30. De acuerdo con Casiano, luego de recibir los manuales antes expuestos, este solo recibía charlas sobre la necesidad de disminuir la duración de las entregas y el protocolo de seguridad, específicamente sobre estar "más pendientes a los alrededores… [q]ue no se duerman, que verifiquen el área antes de bajarse".

31. Para cumplir con el protocolo—es decir lo que se iba a hacer y cómo se iba a hacer—Casiano se dejaba llevar por la explicación que le daba un compañero con más experiencia.

32. Casiano no seguía protocolo escrito, sino que se dejaba llevar por la enseñanza que le dio el compañero anterior. Le enviaban un compañero con más experiencia que él a explicarle como se debe trabajar en el área. O sea, dentro del camión como tal. Lo que se va a hacer y cómo se van a hacer las cosas.

**Hechos que no están en controversia relacionados con el procedimiento para hacer entregas y recogidos de valores según surge del testimonio de Casiano y de las admisiones durante las deposiciones que le fueron tomadas.**

33. Como mensajero de camión blindado, Casiano tenía un turno de doce (12) horas y, en algunas ocasiones, era de dieciocho (18) horas.

34. La ruta regular de Casiano era la zona bancaria del área metropolitana, la avenida Muñoz Rivera, la avenida Ponce de León, la avenida Chardón, la avenida Piñero y Plaza las Américas. Como parte de esta ruta, visitaba entre setenta (70) y setenta y cinco (75) comercios—y en algunas ocasiones ochenta (80)—en un turno desde 6:00 a.m. hasta las 5:00 p.m. o 6:00 p.m.

35. En su ruta regular, Casiano visitaba entre cuatro (4) y cinco (5) bancos y farmacias para entregar dinero, así como el centro comercial Plaza las Américas, la cafetería del Tribunal Federal, supermercados, colecturías y puestos de gasolina con el objetivo de

transportar valores, hacer entregas y recoger dinero en efectivo.

36. El turno podía excederse de las doce (12) horas debido a que Casiano aceptaba realizar una entrega adicional, que, típicamente, era la de las facilidades de UPS ubicadas en la avenida Antonio "Tony" Santana, carretera 150, Sector Central, CAF 1 de la Base Aérea Muñiz, Aeropuerto Internacional Luis Muñoz Marín en Carolina, Puerto Rico.

37. Casiano realizaba todos sus recogidos y entregas durante el día con excepción de la de UPS que la hacía en la noche.

38. Al comenzar su día de trabajo, Casiano recibía unos bultos con un papel que indicaba el contenido de estos, que podía ser efectivo, prendas y papeles importantes.

39. Casiano realizaba las entregas y los recogidos de valores utilizando su uniforme que era provisto por la empresa, así como la pistola costeada por él, dos peines, el radio "walkie-talkie" y el chaleco antibalas. El uso del "walkie talkie" y del chaleco antibalas era opcional porque eran financiados por los propios empleados de Ranger.

40. Casiano utilizaba el chaleco antibalas—adquirido por él mismo— durante el día, pero, como su uso era opcional, los días que sentía mucho calor no lo utilizaba.

41. Según Casiano, es un requisito para realizar las funciones de mensajeros tener un arma porque, al trasportar dinero, se tiene que proteger a sí mismo, así como para intimidar si las circunstancias lo ameritan debido a que "casi siempre" están mirando a los mensajeros de Ranger.

42. Al ser diestro, Casiano mantenía su arma a su mano derecha.

43. Cuando Casiano laboraba como escolta, como parte del proceso de entregar valores, primero se bajaba del camión blindado el escolta y luego el mensajero. Casiano verificaba el perímetro y, posteriormente, le hacía una seña al mensajero para que se bajara del camión. Después, él y el mensajero entraban al establecimiento y lo verificaban. Tras hacer la entrega en el establecimiento, Casiano salía para verificar la parte de afuera y, luego, le hacía señas al mensajero para que ingresara de nuevo al camión blindado.

44. Si había algún individuo sospechoso en el área de entrega, Casiano como escolta se bajaba primero, "le decía que no" al mensajero, se montaban y se marchaban sin hacerle la entrega al cliente. Posteriormente, regresaban para hacerle la entrega al cliente.

45. Fernando Nieves Cruz (en adelante "chofer" o "Nieves") fue el chofer de Casiano durante ocho (8) años; es decir, se trató de la misma persona desde que Casiano comenzó a desempeñarse como mensajero.

46. Cuando Casiano llegaba a un establecimiento para recoger dinero, antes de bajarse del camión blindado, verificaba los alrededores por los espejos y por los cristales que tenía en la parte de al lado y en la parte de atrás.

47. Luego de verificar los alrededores por los espejos y por los cristales, Casiano le decía al chofer "Chequéate tú adelante. ¿Está claro el día?". Si el chofer le confirmaba que estuviera "claro"—que significaba que no hubiera nada sospechoso—, Casiano se bajaba del camión blindado.

48. Con una mano, Casiano abría la puerta del camión blindado y, en la otra mano, tenía la pistola o la tenía cerca de ésta.

49. Una vez Casiano se bajaba del camión blindado, Casiano caminaba a la acera y de la acera al interior del comercio, lo que el demandante consideraba como "caminatas bien cortas".

50. En algunas localidades, como en Plaza las Américas, al recoger dinero, Casiano tenía que caminar bastante. Se bajaba del camión con el bulto vacío y lo iba llenando de efectivo según las tiendas que visitaba.

51. Cuando tenía que hacer recogidos en Plaza las Américas, Casiano, quien estaba armado, verificaba los alrededores, y, luego, le decía al chofer que lo recogiera en un lugar diferente al que lo dejó. Tras Casiano recoger el dinero en diferentes comercios que se ubicaban en los tres pisos del centro comercial, Casiano se dirigía al área donde había acordado con su chofer que lo recogería. Antes de salir de Plaza las Américas, Casiano verificaba los alrededores para fines de seguridad y, haciendo unas señas, le decía, al chofer, que estaba "todo bien" y que se podía acercar a la salida.

52. En estos recogidos en Plaza las Américas, Casiano era escoltado por los guardias de seguridad del centro comercial que se comunicaban entre sí para avisar que Casiano había llegado a los predios del establecimiento. Sin embargo, al caminar, los guardias de seguridad mantenían distancia de Casiano y lo seguían por las cámaras.

53. Al realizar los recogidos y/o entregas, Casiano se estacionaba, regularmente, en el exterior de los establecimientos, siendo el mismo lugar en el que se estacionaban el resto de las personas.

54. En la mayoría de los establecimientos, el chofer intentaba estacionarse de tal forma que la puerta del lugar al que debían acudir quedara justo al frente de la puerta del camión blindado, incluso si estaban obligados a hacer una doble línea. Sin embargo, había ocasiones que estaban impedidos de seguir este procedimiento porque las aceras eran muy anchas; es decir, no se podían estacionar tan cerca de la puerta.

55. Cuando Casiano regresaba de los establecimientos con los bultos que tenían dinero, no tenía ayuda para abrir el camión blindado, sino que él mismo tenía que abrir el camión, dejar la valija y cerrar el camión.

56. Debido a que Casiano realizaba este procedimiento continuamente, ya se encontraba en automático: "tac, abríamos, mirábamos para todos lados, entregábamos el bulto y, vámonos".

57. Hubo ocasiones en los que Casiano tuvo escoltas, pero, debido a que este caminaba rápido, los escoltas se quedaban atrás, y Casiano les decía: "Mira, vete para el camión que yo sigo solo". De acuerdo con Casiano, era más peligroso estar pendiente del escolta.

58. El chofer del camión blindado solo se bajaba del camión cuando necesitaba ir al baño.

59. El proceso de verificación del perímetro, antes de bajarse del camión blindado, le tomaba dos (2) minutos a Casiano. No obstante, el proceso desde que el camión blindado llega al establecimiento hasta que terminan con el proceso de entrega o recogido de los valores tiene, usualmente, una duración máxima de diez (10) minutos.

60. Ranger no tiene un tiempo límite para bajarse del camión blindado, así como tampoco hay un máximo de tiempo para para entrar al establecimiento y salir de este.

61. Casiano seguía este mismo procedimiento en la Corte Federal con la única diferencia de que allí le asignaban un estacionamiento—que ubicaba en la parte de atrás del establecimiento—y se registraba con el guardia de seguridad antes de subir a la cafetería.

62. Solo en la Corte Federal, Casiano tenía acceso a estacionarse en un área restringida.

**Hechos que no están en controversia relacionados con las entregas de valores (bulto con dinero) realizadas por Casiano en UPS según surge del testimonio de Casiano y de las admisiones durante las deposiciones que le fueron tomadas.**

63. Casiano comenzó, entre 2012 y 2013, a hacer la ruta de UPS.

64. Casiano realizaba las entregas en las oficinas de UPS que están localizadas en el aeropuerto las noches de los martes y los jueves entre las 7:30 p.m. y las 8:00 p.m., pero, particularmente, los jueves. Es decir, si en la semana tenía que hacer dos entregas, se realizaban martes y jueves, pero, si solo tenía que acudir un día, iba los jueves.

65. Durante el tiempo en el que Casiano fue mensajero de Ranger, realizó más de treinta (30) entregas en las oficinas de UPS en el aeropuerto entre el 2013 y el 2016.

66. En caso de que Casiano tuviera que realizar la ruta adicional a UPS, una vez terminaba con sus entregas, esperaba hasta recibir la entrega para UPS. De esta forma, completaba las horas adicionales para llegar a dieciocho (18) horas de trabajo.

67. A Casiano, le gustaba hacer la entrega a UPS porque recibía un pago adicional por las horas extras—que eran pagadas a tiempo y medio respecto a sus horas regulares.

68. En UPS, Casiano le entregaba los bultos a Germán y Gustavo, dos empleados que, de acuerdo con Casiano, eran empleados de Dunbar—una compañía de entrega y acarreo—y tenían como función custodiar los bultos que les entregaba Casiano hasta que fueran colocados en el avión y, subsiguientemente, este despegara.

69. Desde el 2013—año en que Casiano cogió la ruta de entrega de valijas en UPS, el camión no entraba a través del portón por donde entran los camiones de UPS. Solamente una vez entró con el camión a través del portón porque fue un servicio especial.

70. Durante los años en que Casiano estuvo haciendo las entregas en UPS, la oficina vagón siempre fue la misma.

71. Durante los años en que Casiano estuvo haciendo las entregas en UPS, el camión blindado siempre se estacionaba en el "parking", que era un área abierta.

72. Durante los años en que Casiano estuvo haciendo las entregas en UPS, el camión blindado se estacionaba en el "parking", y Casiano se bajaba caminando con las valijas en sus manos y caminaba hasta la puerta del vagón de UPS.

73. Durante los años en que Casiano estuvo haciendo las entregas en UPS, el área fuera de los portones nunca cambió, sino que siempre estuvo igual.

74. Casiano expresó que el procedimiento que llevaba a cabo una vez el vagón se estacionaba en el área del estacionamiento era el siguiente:

   - Al llegar al establecimiento de UPS en el aeropuerto, el chofer (Nieves) estacionaba el camión blindado en el estacionamiento de CAF—que es un área abierta a la que puede entrar cualquier persona. En el lugar, hay una valla de cemento que separa el estacionamiento a la entrada a las facilidades de UPS. Asimismo, hay un portón de acceso de vehículos que es custodiado por un guardia de seguridad con el objetivo de controlar quiénes ingresan con vehículos a los predios donde se halla UPS. Tras estacionarse, el demandante miraba hacia todos lados, y confirmaba con el chofer que estuviese "claro". Posteriormente, se bajaba del camión blindado, pasaba por el lado de la vaya, saludaba al guardia de seguridad y proseguía hacia el vagón de UPS. Al llegar, tocaba la puerta, un guardia le abría, y entre este y Casiano intercambiaban identificaciones. Asimismo, se le

entregaba, al demandante, una identificación de visitante de UPS al aeropuerto.

75. Durante los años en que Casiano estuvo haciendo las entregas en UPS, lo que cambió fue el procedimiento de entrega de valores que se daba una vez Casiano estaba dentro del vagón:

a. Primer Procedimiento: Una vez dentro del vagón, Casiano caminaba hasta otro portón en el que había una mesa a la intemperie donde entregaba los valores al contacto que le habían indicado que se llamaba Gustavo. Los días que Gustavo no estaba, Casiano le entregaba las bolsas a Germán, hermano de Gustavo. Sin embargo, en este lugar, les picaban mosquitos y plagas, por lo que Casiano solicitó que cambiaran el lugar de entrega. Este procedimiento de entrega se realizó durante cuatro o cinco meses del 2013.

b. Segundo Procedimiento: El segundo lugar de entrega era en una oficina dentro del vagón. En este punto de entrega, Casiano no entregaba su identificación a cambio de una de visitante. En el interior de la oficina del vagón, Casiano entregaba los valores a Gustavo o a Germán. Es importante destacar que, en esta forma de entrega, Casiano esperaba, en el camión blindado, que Gustavo o Germán le avisaran que podía entrar a las instalaciones de UPS. Sin embargo, este lugar de entrega no era el adecuado de acuerdo con Casiano, debido a que había muchas personas mirándolos, por lo que era inseguro. Por tanto, tras varios meses, el punto de entrega de los valores se cambió nuevamente.

c. Tercer Procedimiento- Tras el procedimiento antes expuesto, el punto de entrega se movió al edificio de cemento que tiene UPS en las facilidades que alquila. Este procedimiento duró más de un año.

d. Cuarto Procedimiento- Hubo ocasiones en las que Casiano entregaba los bultos, directamente, en el avión debido a que había que cumplir con el horario específico en el que el avión salía. Una vez Casiano observaba que el bulto estuviera en el interior del avión, este esperaba entre quince (15) o veinte (20) minutos para confirmar que el avión no hubiese regresado. Luego de que transcurría este tiempo, Casiano se retiraba del lugar.

76. Desde que Casiano comenzó a trabajar con la ruta de UPS en 2013, el camión blindado de Ranger nunca entró por el portón vehicular a las instalaciones de UPS en el aeropuerto. Sin embargo, el demandante desconocía quién otorgaba los permisos para que Ranger pudiera entrar con el camión blindado por los portones de UPS.

77. En la Base Muñiz, en el área donde está ubicada la oficina vagón, Casiano nunca se bajó del camión blindado con un escolta.

78. Anterior al día del asalto, a Casiano, nunca lo habían asaltado ni en ningún otro lugar ni en la Base Muñiz.

79. En el área de la Base Muñiz, Casiano nunca había visto algo sospechoso por lo cual no pudiera hacer la entrega.

80. Desde que Casiano comenzó a hacer las entregas a UPS en el aeropuerto, siempre siguió el mismo procedimiento, además de que el área del estacionamiento siempre permaneció igual.

81. En el área donde ubicaba UPS, había postes, además de que siempre había el mismo tipo de iluminación. De igual forma, en el estacionamiento de CAF, había un poste de luz mientras que UPS tenía un poste que iluminaba el área donde entraban los camiones de UPS. No había luz en la Avenida Tony Santana.

**Hechos que no están en controversia relacionados con el asalto del 21 de enero de 2016 según surge del testimonio de Casiano y de las admisiones durante las deposiciones que le fueron tomadas.**

82. El 21 de enero de 2016, Casiano y su compañero chofer (Nieves) llegaron entre las 7:30 p.m. y las 8:00 p.m. al estacionamiento, el cual estaba lleno de carros; es decir, estaba "full".

83. Casiano y su chofer llegaron en el camión blindado, se estacionaron donde siempre se estacionan y no hicieron ninguna gestión para entrar con el camión blindado a través del portón de acceso vehicular de UPS.

84. Antes de estacionarse, hicieron una revisión visual desde el interior del camión blindado.

85. Al ver al guardia de seguridad que se encontraba en la puerta de UPS hablando con un hombre, Casiano y el chofer (Nieves) concluyeron que todo "estaba bien".

86. Nieves estacionó el camión blindado en el mismo lugar donde siempre se estacionaba.

87. Se estacionaron de tal forma que la puerta del camión blindado estuviera justo al frente de la puerta de UPS.

88. Tras estacionarse, Casiano y el chofer del camión blindado comenzaron a comer, al mismo tiempo, dentro del camión.

89. De acuerdo con Casiano, ellos llegaron al estacionamiento de CAF alrededor de catorce (14) minutos antes que Gustavo y Germán, quienes eran los que recibirían los bultos con dinero que transportaba Casiano.

90. Posteriormente, vio llegar a Gustavo el cual, le dio la orden a Casiano de que podía entrar al vagón de UPS.

91. Al recibir la orden de Gustavo, previo a salir del camión, Casiano verificó la cantidad de bultos dentro del camión, observó hacia todos lados, abrió la puerta

del camión volvió a mirar a sus alrededores y le informó al chofer que realizaría la entrega.

92. Subsiguientemente, Casiano se bajó del camión blindado.

93. Casiano admitió que se bajó del camión blindado sin colocarse un chaleco antibalas.

94. Al salir del camión, Casiano bordeó la valla de cemento, pasó por el frente del guardia de seguridad que custodiaba el portón de entrada de UPS y lo saludó.

95. El día del asalto, Casiano realizó el mismo proceso de verificación que hacía cada vez que acudía a UPS. Realizó una ronda ocular de los alrededores. Cuando se encontraba dentro del camión, estuvo mirando a los alrededores todo el tiempo. De igual forma, antes de bajarse del camión blindado, Casiano miró hacia la parte de atrás, así como para el resto de los lados. Tras este paso, Casiano se bajó del camión blindado, bordeó la valla de cemento, saludó al guardia de seguridad y procedió a entrar a la oficina vagón.

96. Casiano admitió que, tras verificar todos los alrededores, no vio nada sospechoso.

97. Cuando Casiano estaba llegando a la puerta del vagón de UPS, escuchó una voz que le dijo: "Dame los valores, esto es un asalto".

98. Casiano indicó, que fue casi inmediato el momento de su llegada a la puerta del edificio de vagón de UPS hasta que le dispararon debido a que el individuo salió de las partes oscuras que enfrentaban la avenida Antonio "Tony" Santana, por lo que no pudo ver al asaltante debido a que "no tiene rayos x". Es decir, el asaltante "apareció de momento", y la interacción entre éste y Casiano tuvo una duración de un par de segundos.

99. Según Casiano, transcurrieron uno o dos minutos desde que este se bajó del camión blindado hasta que fue asaltado.

100. Mientras Casiano era atendido por paramédicos, Casiano no pudo identificar a nadie de Ranger en el área donde sufrió el robo.

101. El camión de Ranger nunca se acercó a Casiano luego de que este hubiera sido disparado.

102. La noche en que Casiano fue asaltado había un guardia en el portón de UPS.

103. Previo al día de los eventos, Casiano nunca había sido asaltado haciendo una entrega, nunca fue víctima de robo en el área de la Base Muñiz y nunca observó algo sospechoso que le impidiera realizar la entrega.

104. Según el supervisor de seguridad de UPS, Ricardo Romero, el único asalto del cual tiene conocimiento que ha ocurrido durante la entrega de valores en los

exteriores del vagón, ubicado en la zona de carga del Aeropuerto Luis Muñoz Marín en Carolina, ha sido el de Casiano.

**Hechos que no están en controversia en cuanto al sistema de CCTV de UPS y los videos de las cámaras de seguridad de UPS del 21 de enero de 2016 según surge de los documentos y evidencias anejadas a la Moción de sentencia sumaria de UPS incluyendo las admisiones de Casiano que surgen de las transcripciones de sus deposiciones.**

105. El día 21 de enero de 2016, las cámaras de seguridad instaladas en los exteriores del vagón ubicado en la zona de carga del Aeropuerto Luis Muñoz Marín en Carolina, Puerto Rico grabaron el incidente alegado por Casiano en su demanda. Las cámaras que grabaron el incidente estaban ubicadas en los exteriores del vagón de UPS.

106. Las cámaras instaladas en UPS son propiedad de UPS y, como tal, son operadas por dicha empresa.

107. El sistema de CCTV de UPS permite que los vídeos obtenidos por las cámaras de seguridad instaladas en la propiedad alquilada por UPS sean obtenidos por estas de manera continua, sin interrupción. Dichos videos se graban en equipos de grabación ("DVR") ubicados en la Oficina de Seguridad dentro de la propiedad y el acceso a ellos está controlado exclusivamente por el Departamento de Seguridad de UPS. Este proceso produce resultados certeros.

108. La cámara que capturó el asalto a Casiano fue la "01". Esta cámara estaba ubicada en la parte superior del punto de cotejo del vagón de UPS. La toma de dicha cámara estaba orientada hacia el exterior, cerca del área de cotejo y la entrada principal de los empleados de UPS.

109. En el vídeo, se observa el camión blindado de Ranger llegando a UPS el 21 de enero de 2016 a las 19:52. En dicho vídeo, se observa a Casiano bajarse del camión a las 20:07, abrir la puerta lateral, montarse nuevamente en el camión y cerrar dicha puerta. Luego, se observa a Casiano bajándose del camión con los valores en mano y luego caminando hacia la entrada principal de UPS a las 20:08. Segundos después, se observa a Casiano cayendo al suelo. A las 20:09, se ven oficiales de ley y orden acercándose a Casiano para prestar primeros auxilios y establecer un perímetro. En ningún momento en el vídeo se observa al conductor o chofer del camión blindado de Ranger bajándose del camión. El vídeo refleja a la ambulancia llegando a la escena a las 20:15, y finalmente, se observa a Casiano siendo transportado en ambulancia fuera de los predios a las 20:31. (Vídeo del Incidente marcado como anejo de la Moción de Sentencia Sumaria de UPS.)

110. Una vez las cámaras grabaron dicho incidente, el pietaje obtenido por ellas se guardó automáticamente en los equipos de grabación DVR ubicados en la Oficina de Seguridad dentro de la Propiedad. El día del

incidente no hubo interrupción en los sistemas de grabación y los vídeos no fueron alterados. Luego de la grabación, no se les realizó ningún tipo de edición. Las grabaciones continúan en los discos duros del Departamento de Seguridad de UPS, permaneciendo íntegras y sin manipulaciones y/o alteraciones.

111. Durante la deposición, Casiano observó el vídeo de la cámara CH01 y CH02 de seguridad de UPS, para el día 21 de enero de 2016 a partir de las 7:21p.m. y reconoció que las grabaciones reflejaban lo ocurrido el 21 de enero de 2016.

112. Observando el vídeo de la cámara uno, que está identificado como CH-01C, Casiano sostuvo que este tenía fecha del 01/21/2016 y hora de las 19:43. Al principio del vídeo, Casiano observó a tres personas dialogando afuera de UPS. Asimismo, identificó que estas personas se encuentran en el estacionamiento de CAF y que observaba la valla de cemento y las cadenas que debía bordear. De igual forma, de acuerdo con Casiano, el guardia de seguridad llamado Jaime que ubicaba en los portones de UPS se encontraba hablando con los otros dos hombres y tenía un chaleco reflector. Posteriormente, Casiano mencionó que un camión de UPS se estaba alineando frente al portón que da acceso al interior del establecimiento. Además, precisó que otros camiones ingresaban por el portón antes mencionado en dirección al interior de las facilidades de UPS en el aeropuerto. Casiano indicó también que se podía observar un área que estaba iluminada y otra que tenía una sombra frente a la puerta de la oficina del vagón debido a que había un biombo de luz cercano. Casiano destacó que, a las 19:52, llegó un camión de UPS, así como el camión blindado de Ranger en el que se encontraba Casiano y este comenzó a estacionarse para que la puerta del vehículo quedara frente a la puerta del establecimiento como tal. El demandante estableció que, mientras el camión blindado estaba estacionado—donde él y el chofer estaban comiendo—, el guardia de seguridad de UPS se encontraba hablando con otros hombres. Casiano añadió que se podían observar carros y hombres saliendo por el área del estacionamiento, así como personas por el área del edificio de vagón de UPS.

113. Viendo el vídeo de la cámara 1, que está identificado como CH-01D, Casiano sostuvo que hay un hombre columpiándose en las cadenas y se ve que otro hombre está saliendo del edificio de vagón de UPS. Además, identificó que el camión blindado se encuentra estacionado donde le permiten hacerlo y que este no ha tenido ningún cambio desde que llegó al lugar. De igual forma, Casiano indicó que el guardia de seguridad que se puede distinguir continúa siendo Jaime. Por otro lado, Casiano identificó que Gustavo y su hermano Germán llegaron al área del estacionamiento de CAF a las 20:06:50, siendo Gustavo el primero que se observa—a quien el demandante describió como un hombre gordito que tiene un bultito— y su hermano el segundo. Antes de que estos se dirigieran al área del vagón de UPS, entró un amigo de Gustavo. Además, Casiano destacó que Gustavo levantó la mano y le hizo unas señas al demandante.

114. Casiano indicó que se bajó del camión blindado a las 20:07:11 del 21 de enero de 2016 porque recibió la señal, por lo que procedió a buscar los valores en la parte de atrás del vehículo entrando por la puerta lateral del camión. Previo a esto, Casiano indicó que la sombra que se observa por los cristales del camión es la suya mientras hace la revisión del perímetro y de los bultos. Tras esto, Casiano le dijo al chofer "Me voy a bajar". A las 20:08, en el vídeo, se observan las dos puertas del camión blindado: la puerta del pasajero y la puerta hacia la parte de atrás del camión que es una puerta lateral. A través del cristal de esa puerta lateral, se observa una sombra que, según Casiano, es porque él se está moviendo dentro del camión. Mientras esto ocurre, afuera siguen estando las mismas tres personas, además de que salió otro empleado de UPS.

115. A las 20:08:21, un vehículo estaba saliendo, además Casiano le hizo señas a Nieves, este abrió la puerta del pasajero nuevamente y Casiano a las 20:08:30, le entregó al chofer una hoja de papel que tenía en su mano izquierda. Mientras esto ocurría, Casiano ya tenía en su mano derecha un bulto. Luego de que Casiano le entregó el papel al chofer, Casiano cerró la puerta a las 20:08:39 y se dirigió hacia la entrada del vagón. Posteriormente, Casiano—aún con la valija en la mano derecha y con la mano izquierda vacía—pasó por el lado del guardia de seguridad y de los otros dos hombres. Tras mirar hacia ambos lados, a las 20:08:44, Casiano caminó por el área derecha de la cadenita y saludó al guardia de seguridad para dirigirse a la entrada del vagón de UPS.

116. A las 20:08:50 del día de los hechos, en el vídeo, el cuerpo de Casiano ya no se observa en el vídeo, pero se puede identificar su sombra. A las 20:08:52, se observa la agresión que sufrió Casiano. Seguidamente, Casiano se encuentra en el suelo y el asaltante se agacha. De acuerdo con Casiano, lo que se percibe del vídeo que está volando es la explosión de la bala.

117. A las 20:08:52, ocurrió la agresión y Casiano cayó al suelo. Posteriormente, a las 20:10:43, el camión blindado se movió hacia adelante y hacia atrás, y, según Casiano, estaba "tirando el 10-50"; es decir, estaba alertando sobre el asalto ocurrido y luego alumbró el área en la que Casiano se encontraba en el suelo. Una persona se agachó para hablar con Casiano, aunque en el área se encontraban además el guardia de seguridad Jaime y Gustavo. Por otro lado, mientras esto ocurría, Nieves continuaba en el camión porque, según Casiano, no se podía bajar, pero tampoco irse.

118. A las 20:11:05, una persona ayudó a Casiano a virarse. El hombre que estaba columpiándose ahora tiene el teléfono en la mano. Además, Germán también tiene un teléfono en la mano. Por su parte, Gustavo abrió la puerta del chofer del camión blindado y comenzó a hablar con este último.

119. A las 20:13:45, Casiano se encuentra en el suelo boca arriba y una persona con camisa de rayas lo está auxiliando.

120. A las 20:16:52, llegaron la ambulancia y los paramédicos. Asimismo, a las 20:17:43, le dieron primeros auxilios a Casiano. Luego, le colocaron oxígeno a Casiano. A las 20:19, los paramédicos continuaban asistiendo a Casiano.

121. El guardia municipal llegó a las 20:21 el día del asalto; es decir, aproximadamente, trece (13) minutos después de la ráfaga de disparos que ocurrió a las 20:08:52.

122. El vídeo de la cámara uno (1), identificado como CH-01D, grabó hasta las 20:23:40 del 21 de enero de 2016.

123. Viendo el vídeo de la cámara uno (1), que está identificado como CH 01E, Casiano observó cómo lo están subiendo a la camilla a las 20:24:32. Además, indicó que hay varios policías en el área. A las 20:25:52, van de camino a montar a Casiano a la ambulancia.

124. Por otro lado, viendo el vídeo de la cámara dos, que está identificado como CH-01D— que muestra el área del portón que otorga acceso vehicular al aeropuerto, y es, además, el lugar por el que ingresan los camiones de UPS, —a las 20:05:48, Casiano identificó al guardia de seguridad que estaba hablando con el hombre que se estaba columpiando en las cadenitas.

125. En la escena se recuperaron 4 casquillos de bala .45, 1 bala .40, y 3 empaques con dinero en efectivo totalizando $142,462.55. La cantidad total hurtada fue $298,118.88.

**Hechos que no están en controversia relacionados con que Casiano conocía el riesgo que corría como mensajero de camión blindado y asumió el mismo porque le gustaba, según surge del testimonio de Casiano y de las admisiones durante las deposiciones que le fueron tomadas a él y a la codemandante Pyon Elizabeth Varona Yong.**

126. Casiano admitió que el trabajo como mensajero de camiones blindados era riesgoso y peligroso.

127. Admitió, además, que, desde que comenzó como mensajero, como parte de su trabajo, estaba expuesto diariamente y enfrentaba el peligro de ser asaltado al entregar o transportar los valores de dinero.

128. Indicó que el peligro de ir a su trabajo era ir a entregar el dinero porque llevaba lo que todo individuo que no trabaja desea tener, que es el dinero.

129. Casiano admitió que dependiendo del sector que le tocara, tenía que estar en alerta de los alrededores.

130. De acuerdo con Casiano, el trabajo de mensajero es compatible con el de un guardia de seguridad porque, como mensajeros, tienen que velar por vidas y propiedades.

131. Incluso, para Casiano, el puesto que este ocupaba hasta el 2016 tenía mayor riesgo, en ciertas partes, que el de un guardia de seguridad porque, en sus funciones, está envuelta su vida y los valores que transportaba.

132. En efecto, Casiano adquirió un seguro de vida, porque conocía que su trabajo como mensajero de camiones blindados era riesgoso.

133. Casiano nunca expresó preocupación con relación al riesgo a su seguridad o al riesgo que se tomaba como mensajero de camión blindado porque sabía que era un trabajo de alto riesgo, pero era lo que él amaba.

134. A Casiano, siempre le gustó su trabajo, le encantaba porque "se lo vivía". Aunque fuera peligroso, se lo vivía.

135. En efecto, la codemandante Varona también sabía que el trabajo que realizaba Casiano era uno de alto riesgo, más toda vez que a Casiano le gustaba, no lo podía cohibir a que no trabajara ahí porque fuera de alto riesgo.

136. Desde que Casiano comenzó a ser mensajero, era consciente de lo anterior. Es decir, conocía el peligro y el riesgo al que estaba sujeta su vida diariamente al ocupar el puesto de mensajero.

137. Los camiones blindados mediante los que Casiano se transportaba eran a prueba de balas y tenían el objetivo de proteger a las personas y bienes que estaban dentro de estos. Para Casiano, tienen que transportar los valores en estos camiones por el peligro que corren. Asimismo, consideraba que es más seguro transportar los valores en un camión blindado que en su carro privado.

138. Mientras Casiano fue mensajero, nunca hizo una entrega que no fuera en un camión blindado.

Inconforme con el proceder del TPI, el 5 de diciembre de 2025, la parte apelante acudió ante este Tribunal mediante recurso de *Apelación* y señala los siguientes errores:

1. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCLUIR QUE UPS NO EJERCÍA CONTROL OPERACIONAL NI TENÍA UN DEBER DE SEGURIDAD RESPECTO AL ÁREA Y AL PROCESO DONDE OCURRIÓ EL INCIDENTE, CONTRARIO A LA EVIDENCIA DOCUMENTAL, OPERACIONAL Y TESTIMONIAL QUE DEMUESTRA LO CONTRARIO.

2. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE NO EXISTÍAN CONTROVERSIAS DE HECHOS MATERIALES, PASANDO POR ALTO CONTRADICCIONES SUSTANCIALES ENTRE LA DECLARACIÓN JURADA DE UPS Y LOS DOCUMENTOS CORPORATIVOS DE LA PROPIA EMPRESA.

3. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ADJUDICAR LA PREVISIBILIDAD DEL ACTO CRIMINAL COMO UNA CUESTIÓN PURAMENTE JURÍDICA,

IGNORANDO EVIDENCIA QUE DEMOSTRABA CONOCIMIENTO PREVIO DEL RIESGO Y ADMISIONES POSTERIORES DE DEFICIENCIAS OPERACIONALES POR PARTE DE UPS.

4. ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ADJUDICAR CREDIBILIDAD, RAZONABILIDAD Y CONDUCTA DEL APELANTE EN ETAPA SUMARIA, EVALUANDO INFERENCIAS Y CONCLUSIONES EN DETRIMENTO DE LA PARTE NO PROMOVENTE, EN VIOLACIÓN DEL MARCO JURÍDICO DE LA REGLA 36 Y LA JURISPRUDENCIA APLICABLE.

**II.**

**A.**

La sentencia sumaria es el mecanismo procesal adecuado para resolver casos en los que no es necesaria la celebración de un juicio por no existir duda sobre los hechos esenciales, contarse con toda la evidencia necesaria y solo restar la aplicación del derecho. Regla 36.3(e) de Procedimiento Civil, 32 LPRA Ap. V; Consejo Tit. v. Rocca Dev. Corp., et als., 2025 TSPR 6, 215 DPR ___ (2025); BPPR v. Zorrilla y otro, 2024 TSPR 62, 214 DPR ___ (2024); Córdova Dexter v. Sucn. Ferraiuoli, 182 DPR 541, 555-556 (2011).

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, regula todo lo relacionado con la moción de sentencia sumaria, sus requisitos y su oposición. CSM v. ELA, 2025 TSPR 78, 216 DPR ___ (2025); Cruz, López v. Casa Bella y otros, 213 DPR 980, 993 (2024). Véase, además, J.A. Cuevas Segarra, *Tratado de derecho procesal civi*l, 2da ed., Estados Unidos, Publicaciones JTS, 2011, T. III, pág. 1038. La aludida regla dispone que la sentencia sumaria puede ser presentada:

> [E]n cualquier momento después de haber transcurrido veinte (20) días a partir de la fecha en que se emplaza a la parte demandada, o después que la parte contraria le haya notificado una moción de sentencia sumaria, pero no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba, una moción fundada en declaraciones juradas o en aquella evidencia que demuestre la inexistencia de una controversia sustancial

de hechos esenciales y pertinentes. . . . Regla 36.1 de Procedimiento Civil, 32 LPRA Ap. V.

Por otro lado, en cuanto a la lista de hechos no controvertidos que la parte promovente debe exponer, esta tiene que desglosarlos en párrafos numerados y, para cada uno de ellos, especificar la página o el párrafo de la declaración jurada y otra prueba admisible en evidencia que lo apoya. Regla 36.3(a)(4) de Procedimiento Civil, 32 LPRA Ap. V.; SLG Zapata-Rivera v. J.F. Montalvo, 189 DPR 414, 432 (2013). Así pues, de la prueba que acompaña la solicitud de sentencia sumaria debe surgir preponderantemente la inexistencia de controversia sobre los hechos medulares del caso. CSM v. ELA, *supra*; Cruz, López v. Casa Bella y otros, *supra*; Aponte Valentín et al. v. Pfizer Pharm., 208 DPR 263, 277 (2021); Zambrana García v. ELA et al., 204 DPR 328, 341-342 (2020).

De manera que, la parte que promueva la sentencia sumaria tiene el deber de exponer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material. CSM v. ELA, *supra*. Los hechos materiales se refieren a aquellos que pueden alterar la forma en que se resuelve una reclamación, de acuerdo con el derecho sustantivo aplicable. Cruz, López v. Casa Bella y otros*, supra*; Zambrana García v. ELA et al., *supra*.

El oponente, por su parte, está obligado a citar específicamente los párrafos que entiende están en controversia y, para cada uno de ellos, detallar la evidencia admisible que sostiene su impugnación con cita a la página o sección pertinente. SLG Zapata-Rivera v. J.F. Montalvo, *supra*. Como norma general, "'para derrotar una solicitud de sentencia sumaria la parte opositora debe presentar declaraciones juradas y documentos que pongan en controversia los hechos presentados

por el promovente'". Ramos Pérez v. Univision, 178 DPR 200, 215 (2010) (citando a Corp. Presiding Bishop CJC of LDS v. Purcell, 117 DPR 714, 721 (1986)). Esto es, la parte que se opone no puede descansar en meras alegaciones. Ramos Pérez v. Univisión, *supra*. En otras palabras, tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. León Torres v. Rivera Lebrón*,* 204 DPR 20, 44 (2020).

Así pues, para que proceda este mecanismo es necesario que de los documentos no controvertidos surja de que no hay una controversia real y sustancial sobre los hechos del caso. Consejo Tit. v. Rocca Dev. Corp., et als, *supra*; Universal Ins. y otro v. ELA y otros, 211 DPR 455, 471 (2023); Ramos Pérez v. Univisión, *supra*, pág. 214. De modo que, el tribunal procederá a dictar la sentencia solicitada si:

> [L]as alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que como cuestión de derecho el tribunal debe dictar sentencia sumaria a favor de la parte promovente". Regla 36.3(e) de Procedimiento Civil, 32 LPRA Ap. V; CSM v. ELA, *supra.*

Al atender la solicitud de sentencia sumaria y su oposición, los tribunales deberán: (1) analizar todos los documentos incluidos en las mociones y aquellos que obren en el expediente del tribunal, y (2) determinar si la parte opositora controvirtió algún hecho material y esencial, o si hay alegaciones de la demanda que no han sido controvertidas o refutadas en forma alguna por los documentos. Torres Pagán et al. v. Mun. de Ponce, 191 DPR 583, 598 (2014).

Sólo procede dictar sentencia sumaria cuando surge de manera clara que, ante los hechos materiales no controvertidos,

la parte promovida no puede prevalecer ante el derecho aplicable y el tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. Serrano Picón v. Multinational Life Ins., 212 DPR 981, 992 (2023); Meléndez González et al. v. M. Cuebas, 193 DPR 100, 109-110 (2015). Es decir, la sentencia sumaria sólo debe dictarse en casos claros, y cualquier duda debe resolverse en contra de la parte que solicita la sentencia. Zambrana García v. ELA, *supra*, pág. 341 (2020); Rivera et al. v. Superior Pkg., Inc. et al., 132 DPR 115, 133 (1992).

Por otro lado, nuestro Tribunal Supremo ha manifestado que no es aconsejable dictar sentencia sumaria en casos donde existe controversia sobre asuntos de credibilidad o que envuelvan aspectos subjetivos, como la intención, los propósitos mentales o la negligencia. Cruz, López v. Casa Bella y otros*, supra*; Aponte Valentín et al. v. Pfizer Pharm., *supra*, pág. 278. De manera que, el tribunal no dictará una sentencia sumaria cuando: "(1) existan hechos materiales controvertidos; (2) haya alegaciones afirmativas en la demanda que han sido refutadas; (3) surja de los propios documentos que se acompañan con la moción una controversia real sobre algún hecho material, o (4) como cuestión de derecho, ésta no proceda". CSM v. ELA, *supra*; citando a Serrano Picón v. Multinational Life Ins., supra.

En cuanto al alcance de la revisión judicial, los tribunales apelativos nos encontramos en la misma posición que el foro primario al evaluar la procedencia de una sentencia sumaria. Sin embargo, nuestra función se limita a: (1) considerar los documentos que se presentaron ante el foro de primera instancia; (2) determinar si existe alguna controversia genuina de hechos materiales y esenciales, y (3) comprobar si el derecho se aplicó

de forma correcta. <u>CSM v. ELA</u>, *supra*; <u>Birriel Colón v. Econo y otro</u>, 213 DPR 80, 91 (2023)*.*

**B.**

El Artículo 1802 del Código Civil de Puerto Rico, 31 LPRA sec. 5141[11], dispone que quien, por acción u omisión cause daño a otro mediando culpa o negligencia, estará obligado a repararlo. La obligación surgirá si el demandante logra establecer, mediante la preponderancia de la prueba, tres elementos: el acto u omisión culposa o negligente; el daño causado y la relación causal entre ambos. <u>Nieves Díaz v. González Massas,</u> 178 DPR 820, 843 (2010).

La culpa o negligencia estriba en la ausencia del debido cuidado y, "en no anticipar y prever las consecuencias racionales de un acto o de su omisión, las cuales una persona prudente y razonable habría previsto en las mismas circunstancias". <u>López v. Porrata Doria,</u> 169 DPR 135, 151 (2006). En nuestro ordenamiento, el concepto de culpa es "tan amplio y abarcador como suele ser la conducta humana e incluye cualquier falta de una persona que produce un mal o daño". <u>Nieves Díaz v. González Massas</u>, *supra,* pág. 843-844. Esta, obra de manera culposa quien no despliega la diligencia de una persona común y ordinaria, de una persona prudente y razonable. <u>López v. Porrata Doria,</u> *supra*; <u>Gierbolini v. Employers Fire Ins. Co.,</u> 104 DPR 853, 860 (1976).

En cambio, para que se configure una causa de acción por una alegada omisión será necesario establecer que existía una

---

[11] El referido Código Civil de Puerto Rico de 1930, según enmendado, 31 LPRA ant. sec. 1 *et seq.,* fue derogado por el Código Civil de Puerto Rico de 2020, aprobado mediante la Ley Núm. 55 de 1 de junio de 2020, según enmendada, 31 LPRA sec. 5311 *et seq*. No obstante, para fines del presente caso, se hace referencia únicamente al Código Civil derogado por ser la ley vigente y aplicable a la controversia ante nuestra consideración.

obligación de actuar, que fue quebrantada y que de haberse realizado el acto omitido se hubiese prevenido el daño. Santiago v. Sup. Grande, 166 DPR 796, 807 (2006). De modo que, la pregunta umbral que hay que hacerse en estos casos es si existía un deber jurídico de actuar de parte del causante del daño. Íd.

La relación causal que debe existir entre la acción u omisión culposa o negligente y el daño se rige en nuestro ordenamiento por la doctrina de la causalidad adecuada, que propone que "no es causa toda condición sin la cual no se hubiera producido el resultado, sino la que ordinariamente lo produce según la experiencia general". Colón Ramírez v. Televicentro de P.R., 175 DPR 690, 707 (2009). Ello implica que la ocurrencia del daño "era previsible dentro del curso normal de los acontecimientos". López v. Porrata Doria, *supra,* pág. 152. Ahora bien, ese deber de anticipar y prever los daños no se extiende a todo peligro imaginable, sino a aquél que llevaría a una persona prudente y razonable a anticiparlo. Elba A.B.M. v. U.P.R., 125 DPR 294, 309 (1990). Si el daño emerge como la consecuencia razonable y ordinaria de un acto negligente, se considerará que el daño es un resultado probable de dicho acto. Valle v. E.L.A., 157 DPR 1, 19 (2002).

### C.

Como norma general, en nuestro ordenamiento no existe un deber de proteger a otras personas de actos criminales que realicen terceros. No obstante, existen situaciones en las una persona o entidad pudiese responder por esos actos criminales. Al respecto, nuestro Tribunal Supremo indicó que:

> …[E]xisten ciertas actividades específicas que conllevan un deber especial de vigilancia, cuidado y protección de quien las lleve a cabo hacia el público en general o hacia ciertas

personas en particular. Esta responsabilidad, que genera un deber de cuidado mayor del exigible a una persona cualquiera, se fundamenta en las circunstancias de la situación — entiéndase, el tiempo, el lugar y las personas— y en las exigencias de la obligación particular en la que se sitúan los involucrado. Santiago v. Sup. Grande, *supra*, pág. 809 (citando a Administrador v. ANR, 163 DPR 48, 60 (2004). (Énfasis suprimido).

No obstante, esto no quiere decir que, los dueños de establecimientos comerciales tengan una responsabilidad absoluta sobre cualquier tipo de daño sufrido. Camacho Rivera v. Richard Mitchell, Inc., 202 DPR 34, 43 (2019); Santiago v. Sup. Grande, *supra,* págs. 806-807. Colón y otros v. K-Mart y otros, 154 DPR 510, 518 (2001) Siendo ello así, es el demandante el que tiene el peso de la prueba para demostrar que el dueño del establecimiento incurrió en un acto u omisión negligente que causó o contribuyó a los daños sufridos por este. Camacho Rivera v. Richard Mitchell, Inc., *supra,* pág. 807.

En J.A.D.M. v. Centro Com. Plaza Carolina, 132 DPR 785, (1993*)*, nuestro Tribunal Supremo aclaró que el deber de proveer seguridad adecuada y razonable se puede deducir cuando el propietario del establecimiento tiene o debió tener conocimiento de actos criminales previos en el área bajo su dominio y control. Camacho Rivera v. Richard Mitchell, Inc., *supra,* pág. 44. Así como, de eventos que hagan que una persona prudente y razonable pueda anticipar la ocurrencia de tales actos. Íd. No obstante, se deberá analizar si se tomaron medidas adecuadas para prevenir tal acto delictivo. En específico, algunas medidas adoptadas dependerán, entre otras cosas, de:

> (1) [L]a naturaleza del [establecimiento comercial] y las actividades que allí se llevan a cabo; (2) la naturaleza de la actividad criminal que se esté registrando en el área del [comercio], y (3) si las medidas de seguridad que se adopten son razonables y van dirigidas a minimizar la posibilidad de que los patrocinadores del [establecimiento comercial] sufran daños causados por la actividad criminal intencional de terceros. Íd.

**III.**

La parte apelante alega que erró el TPI al concluir que UPS no ejercía control operacional ni tenía un deber de seguridad respecto al área donde ocurrió el incidente. Asimismo, aduce que el foro primario incidió al determinar que no existía controversia de hechos materiales que le impidiera dictar sentencia sumaria. También, la parte apelante entiende que el aludido foro erró al adjudicar la previsibilidad del acto criminal como una cuestión puramente jurídica, tal como ignoró evidencia que demostraba conocimiento previo del riesgo y admisiones posteriores de deficiencias operacionales por parte de UPS. Como último error, sostiene que el TPI incidió al adjudicar credibilidad, razonabilidad y conducta del apelante en etapa sumaria, en violación del marco jurídico de la Regla 36 de Procedimiento Civil y la jurisprudencia aplicable.

Al estar estrechamente relacionados, discutiremos el primer y segundo error en conjunto.

En el caso de autos, la parte apelante presentó la *Demanda* del epígrafe contra UPS, en el cual le imputó negligencia por este haber sido asaltado y baleado cuando ejercía como mensajero de camión blindado para la compañía Ranger America. La noche del incidente, este realizaba la entrega de un bulto (maletín o valija) con dinero en las facilidades de la Base Aérea Muñiz en el Aeropuerto Internacional Luis Muñoz Marín. En la *Demanda,* la parte apelante alegó que el personal de UPS no le permitió entrar con el camión blindado dentro de las facilidades para que este pudiese entregar las valijas de dinero de manera segura. Por tanto, sostuvo que UPS era responsable del daño ocurrido ya que faltó a su deber de haber tomado aquellas medidas razonables y adecuadas de seguridad. No obstante, el foro primario concluyó

que la parte apelante no logró configurar una causa de acción en daños y perjuicios en contra de UPS. Veamos.

Como primer error, la parte apelante entiende que el TPI ignoró que existían hechos materiales en controversia que impedían resolver el pleito mediante sentencia sumaria. Este ahondó en que, en la moción *Réplica a la Sentencia Sumaria de UPS y para que se dicte Sentencia Sumaria a su favor* presentada por este, reclamó al foro primario que la mayoría de los hechos alegados por UPS en su sentencia sumaria dependen exclusivamente de interpretaciones contractuales hechas mediante declaración jurada del Gerente de UPS. Sobre ese punto, analizamos la solicitud de sentencia sumaria de UPS, su réplica, dúplica y la solicitud de sentencia sumaria presentada por la apelante, y no vimos controversia de hechos materiales que impidan resolver el pleito de manera sumaria.

Según reseñamos, la parte que se oponga a una sentencia sumaria está obligado para cada uno de los hechos que entienda como controvertidos, detallar la evidencia que sostiene su impugnación SLG Zapata-Rivera v. J.F. Montalvo, *supra*.  Por lo general, esto se hace mediante declaraciones juradas y documentos que pongan en controversia los hechos presentados por el promovente. Ramos Pérez v. Univisión, *supra,* pág. 215. Por tanto, este no puede descansar en meras alegaciones, sino que tiene el peso de presentar evidencia sustancial que apoye su impugnación. León Torres v. Rivera Lebrón*, supra,* pág. 44.

En esencia, la parte apelante se limitó indicar que existen controversias de 27 hechos por las siguientes razones: (1) la declaración jurada del Gerente de UPS no puede interpretar lo que se establezca en un contrato y; (2) que es al tribunal a quien le compete determinar la mayoría de los hechos reseñados en la

sentencia sumaria de UPS.[12] De modo que, la parte apelante no detalló evidencia admisible ni declaración jurada alguna que sostenga su impugnación de ningún hecho, lo cual quebranta las exigencias provistas por la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, y nuestra jurisprudencia. Más bien, este se limitó a presentar alegaciones, conclusiones y argumentaciones que no fueron apoyadas con prueba, lo cual no logra establecer que exista hechos controvertidos que impidan resolver mediante sentencia sumaria.

Conviene mencionar que, la aludida declaración jurada está sustentada y bien fundamentada con evidencia admisible.[13] Es decir, esta no se apoyó en el vacío, sino que en ella se anejó contratos que respaldaron lo constatado allí. Además, contrario a lo que nos indica la parte apelante, la mayoría de los hechos materiales surgen de las propias admisiones de este durante sus deposiciones y no de interpretaciones contractuales. De todo lo anterior, concluimos que el TPI no erró al dictar sentencia sumaria a favor de UPS, toda vez que la parte apelante no logró controvertir hecho alguno que le impidiera al juzgador de los hechos resolver de esa forma.

Como segundo error, la parte apelante plantea que el foro primario omitió evaluar los documentos contemporáneos generados por UPS el día del incidente. Tales documentos consisten en unos correos electrónicos emitidos durante la madrugada siguiente al incidente por el Supervisor de Seguridad de UP. En estos, la parte apelante alega que UPS asumió la responsabilidad de evaluar sus mecanismos de seguridad e

---

[12] Entrada #135 de SUMAC TPI.
[13] Entrada #113, Anejo 6 de SUMAC TPI.

identificó deficiencias propias, sin mencionar al Caribbean Airport Facilites (CAF) como encargado de proteger y cuidar del área.

De lo anterior, la parte apelante entiende que tal omisión constituye una admisión de parte. Ahora bien, de una lectura de los correos electrónicos, estos tenían como propósito el buscar alternativas de seguridad para el personal de UPS y Ranger American, dado al trágico incidente del apelante. Somos de la opinión que, tales comunicaciones no constituyeron una admisión de parte. Más bien, es lo menos que se espera de una empresa para el cuidado de su personal, luego de un acto delictivo como el ocurrido. Así pues, resultaría contrario a derecho concluir que, de estos correos electrónicos, UPS admitió que donde ocurrió el incidente se encontraba bajo el control y supervisión directa de estos, así como de la seguridad del área.

Igualmente, parte apelante aduce que la Demanda presentada por UPS en contra de CAF, caso CA2021CV01116, revelan que CAF no es el encargado de la seguridad. En síntesis, UPS radicó esa Demanda contra CAF para que cumpliera con los términos del contrato de arrendamiento suscrito entre las partes, proveyera cubierta para UPS por razón de las reclamaciones hechas por el señor Casiano Vega, respondiera a esta por cualquier daño y proveyera representación legal.

La parte apelante entiende que, dado a que, UPS no le imputó el deber de seguridad a CAF hacen más probable el hecho de que estos son responsables de ello. En otras palabras, que tal omisión en el pleito independiente debería ser considerada en este pleito como prueba de que CAF no era responsable de garantizar la seguridad. No obstante, nos resulta impertinente al caso de autos la controversia entablada por UPS en contra de CAF por incumplimiento contractual. En nada abona a este caso, por

lo que, sería especulativo y contrario a derecho utilizar la referida Demanda como prueba de que UPS es responsable de la seguridad del área.

Aparte de lo mencionado, nos resulta pertinente resaltar, que en la *Sentencia* dictada en el caso FDP2018-0014, se determinó que la propiedad en la cual ocurrió los hechos no está bajo el control ni mantenimiento de UPS, sino que pertenece a CAF quien, a su vez, tenía el control y mantenimiento del área donde ocurrieron los hechos. Esta, no fue reconsiderada, apelada, ni revocada por lo que la misma advino final y firme.

En cuanto al tercer error sobre la previsibilidad del acto criminal como una cuestión puramente jurídica, el mismo no fue discutido. Pese a que, la parte apelante hizo tal señalamiento de error, omitió en su recurso de *Apelación* explicar el mismo. Por lo que, no nos puso en posición para atenderlo.

Como último error, la parte apelante se limitó a reiterar los argumentos ya señalados en el primer y segundo error. Igualmente, no expuso en ninguna parte de su recurso cuáles fueron los hechos relacionados con credibilidad, razonabilidad y conducta del apelante que el TPI consideró al dictar sentencia sumariamente. Por tanto, prescindimos de volver a explicar lo ya señalado.

Así pues, por las razones antes descritas, sostenemos que el foro primario no erró al desestimar sumariamente la *Demanda* de autos. La parte apelante no controvirtió, de forma alguna, la solicitud de sentencia sumaria presentada por UPS. Como vimos, los hechos materiales incontrovertidos de este caso demuestran que no existe responsabilidad alguna entre los hechos alegados y los daños reclamados en la *Demanda*. Además, la parte apelante

no logró configurar una causa de acción en daños y perjuicios en contra de UPS.

**IV.**

Por los fundamentos antes expuestos, se confirma el dictamen apelado.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones